IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES OF AMERICA,       )
                                )
                Plaintiff,       )
                                )
        v.                       )        Criminal Action No.
                                )        14-00034-01-CR-W-BP
LONNIE T. BLACK,                 )
                                )
                Defendant.       )

## REPORT AND RECOMMENDATION TO GRANT
## DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

Before the court is defendant's motion to suppress evidence on the ground that the stop of his vehicle was not supported by reasonable suspicion. I find that (1) air fresheners hanging from a rearview mirror did not constitute a violation of municipal ordinance 70-849(a), (2) the officers' mistake of law was not objectively reasonable, and (3) the stop of defendant's car was not supported by reasonable suspicion that illegal drugs would be found in the car. Therefore, defendant's motion to suppress should be granted.

## I.    BACKGROUND

On June 14, 2013, Officer Whetro pulled defendant over for having an object hanging from his rear view mirror. Officer Whetro believed this was a violation of a municipal ordinance. Once defendant had been pulled over, Officer Whetro smelled marijuana coming from defendant's car and also learned that defendant had outstanding warrants. Defendant was placed under arrest and searched, resulting in the seizure of cocaine. A search of defendant's car revealed marijuana and a firearm.

On February 13, 2014, an indictment was returned charging defendant with one count of possessing a firearm after having been convicted of a felony and one count of possessing a firearm while an unlawful user of a controlled substance.  Defendant filed the instant motion to suppress on January 15, 2015.  On January 26, 2015, the government filed a response, arguing that it was objectively reasonable for Officer Whetro to believe that the air fresheners he saw hanging from defendant's rear view mirror constituted a violation of the ordinance, and alternatively arguing that the stop was supported by reasonable suspicion that illegal drugs would be found in the car.

On January 28, 2015, I held an evidentiary hearing on defendant's motion to suppress.  The government appeared by Assistant United States Attorney Jess Michaelsen.  The defendant was present, represented by Assistant Federal Public Defender Travis Poindexter.  The following witnesses testified:

1.      Officer Slade Whetro, Kansas City, Missouri, Police Department

2.      Officer Dain Apple, Kansas City, Missouri, Police Department

        In addition, the following exhibits were admitted:

P. Ex. 1        Google Maps aerial photo of auto detailing shop located on northeast corner of 57th Street and Prospect Ave., Kansas City, Missouri;

P. Ex. 2        Google Maps aerial photo of area between 53rd and 57th Street near Prospect Ave., Kansas City, Missouri;

P. Ex. 3        Photo/image of Royal Pine air freshener;

P. Ex. 4        REJIS records summary of User IDs as found on REJIS report for log tape searches between 6/07/2013 and 6/14/2014 regarding inquiries made of Missouri license plate KK7J2R;

P. Ex. 5        REJIS report for log tape searches between 6/07/2013 and 6/14/2014 regarding inquiries made of Missouri license plate KK7J2R;

2

P. Ex. 6        Printout of Kansas City, Missouri Municipal Ordinances § 70-849 and § 70-850.

D. Ex. 10       Black Ice air freshener.

## II.    EVIDENCE

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact:

1.      In June 2013, Officer Slade Whetro had been on the job for approximately two months and was still on patrol with a field training officer (Tr. at 6, 37). His patrol area included the intersection of 57th Street and Prospect Avenue in Kansas City (Tr. at 6). At that intersection is an auto detailing shop (Tr. at 8-9). The shop would wash and detail cars as opposed to performing body or mechanical work (Tr. at 9).

2.      Officer Whetro had been told by several sources that someone at the auto detailing shop was selling PCP, cocaine, marijuana and guns out of the shop (Tr. at 9, 67). Two of the individuals providing this information had just left the auto detailing shop prior to providing the information (Tr. at 10). They had been stopped by Officer Whetro for traffic violations after leaving the shop, and the individuals were found to be in possession of illegal drugs (Tr. at 10, 54). A third person was in a car wreck and told Officer Whetro about the car detailing shop (Tr. at 10). Two other individuals who had small traffic warrants and were the subject of routine stops on separate occasions provided the same information to Officer Whetro about drugs and guns being sold out of the auto detailing shop (Tr. at 10-11).

3.      Officer Whetro began watching the shop with a pair of binoculars (Tr. at 11). He would park his car near the shop and watch it, and also watch vehicles coming

3

and going from the shop (Tr. at 11, 68). He observed that vehicles would sometimes back into the shop, the garage door would be pulled down, and 5 to 15 minutes later the cars would leave and head southbound on Highway 71, which is about a block east of the shop (Tr. at 11, 55).

4.    On several occasions, Officer Whetro drove by the auto detailing shop while a vehicle was inside the garage (Tr. at 12). Immediately upon seeing the patrol car, the individuals inside would run to the garage door and pull it down, or they would quickly go inside the business, providing the impression they did not want to be seen by the police (Tr. at 12, 69).

5.    Officer Whetro ran the license plates of some of the cars that had gone in and out of the auto detailing shop (Tr. at 12). He learned that several of the vehicles were rental cars, and they too would stay at the shop only 5 to 15 minutes (Tr. at 13, 54, 68). Officer Dain Apple (Officer Whetro's field training officer) is aware that people sometimes use rental cars when conducting illegal drug transactions (Tr. at 85-86). Officer Apple observed cars parked along the streets by the shop as well as in parking lots on the north side and southeast of the shop, and the occupants of those cars would walk to the detail shop (Tr. at 69). Pedestrians were observed going into the auto detail shop (Tr. at 68).

6.    Defendant's car, a Dodge Magnum, had been seen at the auto detailing shop on each of three days prior to his arrest (Tr. at 12, 22). On those days, Officer Whetro observed defendant's car at the shop, then he observed that the car was gone, and then he would observe the car at the shop again (Tr. at 12). He actually saw defendant's car coming and going from the shop (Tr. at 15). In weeks leading up to

4

defendant's arrest, Officer Whetro had seen defendant's car at the shop, either parked across the street or parked in front of the shop, at least every other day (Tr. at 12-13, 14, 22).  Officer Whetro never saw any difference in the car -- "there was never any damage or any repairs made on the outside" (Tr. at 15).  During the week before defendant's arrest, Officer Apple, Officer Whetro's field training officer, had observed defendant's car parked on the streets or in the parking lots around the auto detail shop, and he had observed defendant in the shop and coming and going from the shop (Tr. at 70-71).

7.      Defendant was never seen in his car -- his windows were tinted and Officer Whetro could only observe that he was male (Tr. at 14, 60).  Officer Apple testified that he did not know who was operating the vehicle, that "we weren't able to tell who was the driver" (Tr. at 72).  The license plate on the car was registered to a woman (Tr. at 16).  Police use the REJIS system to run license plates and individuals -- it can indicate whether license plates are registered to the car on which they are displayed, it can pull up Department of Revenue information about a vehicle and its owner, and it can pull up warrants (Tr. at 16-17).  REJIS can be accessed from patrol cars (Tr. at 16).

8.      Officer Whetro ran the license plate for defendant's car on June 11, 2013, at 4:08 p.m. (Tr. at 18-19).  There were no active warrants for anyone associated with the car (Tr. at 19).  Officer Whetro ran the license plate again that same day at 8:55 p.m. (Tr. at 19).  He was double checking that it was the correct vehicle (Tr. at 19-20).  On June 14, 2013, at 2:42 p.m., Officer Whetro again ran the license plates through REJIS after the car had been seen at the auto detail shop (Tr. at 20, 73).  The REJIS

5

report indicates two names associated with the car, Lonnie and Bessie, neither of which shows any NCIC wants (Tr. at 57-58).

9.      Officer Whetro had come to suspect that the person in the Dodge Magnum was involved in some illegal activity associated with the auto detailing shop (Tr. at 59).

10.      At approximately 8:00 p.m., on June 14, 2013, Officers Apple and Whetro were traveling southbound on Highway 71 and then turned westbound onto 53rd Street (Tr. at 22, 34, 73).  They saw the Dodge Magnum facing eastbound on 53rd Street, preparing to turn southbound onto Highway 71 (Tr. at 22, 44, 73).  The officers saw "a bunch of air fresheners" hanging from defendant's rear view mirror (Tr. at 23, 44, 73). This was the first time Officer Whetro  had seen air fresheners hanging from defendant's rear view mirror (Tr. at 23-24).  He could not tell how many air fresheners were hanging from the mirror, but the group of them was approximately three to four inches thick (Tr. at 24).  The air fresheners were shaped like trees (Tr. at 24).

11.      In Officer Apple's experience, people who use drugs in their cars often have one or more air fresheners in their cars to mask the smell of drugs (Tr. at 70). When one air freshener becomes weak, they add more fresheners (Tr. at 70).  Officer Apple was driving the patrol car on this day with Officer Whetro as a passenger (Tr. at 34).  Based on his training and experience to date, Officer Whetro believed that the stack of air fresheners interfered with defendant's view of the street (Tr. at 25).  Officer Apple also believed that the air fresheners constituted a violation of a Kansas City ordinance because it constitutes vision blocking material on the windshield or windows of the vehicle (Tr. at 74).  Officer Apple drove south to 55th Street and they sat there for

6

a little bit waiting for defendant's car to pass that street (Tr. at 23).  Officer Whetro eventually observed defendant pass 55th Street on Highway 71 (Tr. at 23).  Officer Apple drove the patrol car out onto Highway 71 and attempted to catch up with defendant's car which took a while because of all the traffic (Tr. at 23).  He stopped defendant's car on Highway 71 southbound at approximately Gregory[1] (Tr. at 34, 77).

12.     Officer Whetro approached defendant's car and, as he was speaking with defendant, smelled the odor of marijuana emanating from the car (Tr. at 34, 35, 52-53).  Officer Whetro got defendant's driver's license and gave it to Officer Apple who returned to the patrol car to run the license through REJIS (Tr. at 34, 78).  He learned that defendant had several active arrest warrants and that his driver's license had been suspended (Tr. at 36, 79).  Defendant was removed from his car and placed in handcuffs (Tr. at 36).  A search of defendant's person produced a bag of cocaine, found in his left front pocket (Tr. at 36-37, 79).  A drug dog was called; and when the dog performed a sniff search of the car, it alerted positively to the front windshield area of defendant's car (Tr. at 36, 79).  A bag of marijuana was found in the headliner area of the vehicle right above the driver's seat (Tr. at 36, 80).  During a search of the vehicle, officers recovered a gun from under the back seat (Tr. at 37, 80).

13.     Defendant was issued a ticket for a violation of Section 70-849(a) of the Kansas City Municipal Ordinances (Tr. at 25; P. Ex. 6).  That same day, Officer Whetro prepared an incident report which may have been reviewed by Officer Apple before it was submitted to the sergeant (Tr. at 41, 81).  The report states that defendant was

_____

[1]Gregory is two miles south of 55th Street on Highway 71.

stopped because vision obstructing material was a violation of Section 70-849(a) (Tr. at 44, 45). No other basis for the stop was listed in the report (Tr. at 44). No photographs or videos were made of the air fresheners, and the "vision obstructing material" was not identified in the police report (Tr. at 51).

14.    Officer Whetro had not received any instruction on writing tickets for air fresheners as violations of that ordinance, but his field training officer indicated that it was fine to write the ticket and said that he had written several such tickets prior to that day (Tr. at 26, 76). Officer Whetro had issued one ticket prior to that day for another individual who had an air freshener hanging from a rear view mirror (Tr. at 26, 47).

15.    Prior to June 14, 2013, it was Officer Whetro's understanding that section 70-850 dealt with windshields being obstructed with things such as dark tint (Tr. at 30, 46). He believed that Section 70-849 precludes not only air fresheners but things on the dash of a car (Tr. at 45). While at the police academy, he was advised to become familiar with municipal ordinances but was not specifically taught them and was not tested on them (Tr. at 38-39, 61-62). Prior to June 14, 2013, Officer Whetro had never had any instruction or training about Section 70-849 (Tr. at 46-47). He is aware of no particular code that indicates it is improper to hang something from a rear view mirror (Tr. at 46).

## III.    *TERRY STOP*

The Fourth Amendment prohibits "unreasonable searches and seizures" by the government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest. United States v. Arvizu, 534 U.S. 266, 273 (2002); Terry v. Ohio, 392 U.S. 1, 9 (1968). A traffic stop constitutes a "seizure" within

8

the meaning of the Fourth Amendment, <u>Brendlin v. California</u>, 551 U.S. 249, 255 (2007), and must be reasonable under <u>Terry v. Ohio</u>. In general, "a traffic stop must be supported by at least a reasonable, articulable suspicion that criminal activity has occurred or is occurring." <u>United States v. Salazar</u>, 454 F.3d 843, 847 n.3 (8th Cir. 2006); <u>United States v. Ehrmann</u>, 421 F.3d 774, 780 (8th Cir. 2005), <u>cert</u>. <u>denied</u>, 546 U.S. 1122 (2006). Traffic violations, however minor, create probable cause to stop a vehicle. <u>Id</u>.

### A. STOP BASED ON ORDINANCE VIOLATION

The totality of the circumstances determines whether officers have reasonable suspicion to justify a stop. <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989). "Reasonable suspicion is a lower threshold than probable cause, and it requires considerably less than proof of wrongdoing by a preponderance of the evidence." <u>Williams v. Decker</u>, 767 F.3d 734, 739 (8th Cir. 2014) (internal citation omitted); <u>United States v. Carpenter</u>, 462 F.3d 981, 986 (8th Cir. 2006).

In this case, Officers Whetro and Apple testified that defendant was stopped because he had a stack of air fresheners hanging from his rear view mirror which, they both believed, was a violation of municipal ordinance 70-849(a) which reads as follows:

> No person shall drive any motor vehicle with any sign, poster, snow, ice or other nontransparent material upon the front windshield, side wings or side or rear windows of such vehicle which interferes with the drivers [sic] normal view of the street or highway or any intersecting street or highway.

(P. Ex. 6).

Although the government does not explicitly concede in its response that defendant's alleged conduct was not a violation of Section 70-849(a) ("the ordinance"),

9

it makes no argument that the conduct does violate that ordinance. Instead, the government argues that the officers' mistaken belief that defendant was violating that ordinance was an objectively reasonable mistake.

"The Fourth Amendment tolerates only reasonable mistakes, and those mistakes -- whether of fact or of law -- must be objectively reasonable. We do not examine the subjective understanding of the particular officer involved." <u>Heien v. North Carolina</u>, 135 S. Ct. 530, 539 (2014).[2] Although both officers in this case testified about their own beliefs as well as events that strengthened those subjective beliefs, those events occurred after the stop in this case and are therefore irrelevant, as are the officers' subjective belief that air fresheners hung from a rear view mirror violates the ordinance.

At the time defendant was stopped, Officer Whetro had been on the job for two months. Although Officer Whetro had been watching defendant's car for several weeks, defendant had never been seen in his car -- his windows were tinted. Officer Whetro could only observe that the driver was male. Officer Apple did not observe defendant either: "We weren't able to tell who was the driver." On the day of defendant's arrest, the officers were turning westbound onto 53rd Street when they saw defendant's car facing eastbound on 53rd Street. The officers saw "a bunch of air fresheners" hanging from defendant's rear view mirror, approximately three to four inches thick and shaped like trees. Based on his training and experience to date,

---

[2]Prior to this Supreme Court decision in December 2014, the courts of appeals were split on whether a reasonable mistake of law could justify a traffic stop for Fourth Amendment purposes.

Case 4:14-cr-00034-BP   Document 27   Filed 02/13/15   Page 10 of 22

Officer Whetro believed that the stack of air fresheners interfered with defendant's view of the street.

Although defendant was issued a ticket for a violation of the ordinance, in no police report was the "obstructive material" identified or described. No pictures were taken. There is no evidence that the air fresheners were removed from defendant's rear view mirror at any time by the police. Officer Whetro was unable to recall during the hearing precisely what the obstructive material was except that he remembered it was a stack of pine-shaped air fresheners and perhaps something else (Tr. at 24).

At the outset, I find that the air fresheners hanging from the rear view mirror do not constitute a violation of the ordinance.[3] It is undisputed that the air fresheners were not "upon the front windshield, side wings or side or rear windows". When the plain meaning of a statute does not lead to an absurd result, judicial inquiry is at an end and the statute must be enforced as written. United States v. Jungers, 702 F.3d 1066, 1069 (8th Cir. 2013). The question, therefore, is whether the officers' mistaken belief that the ordinance was being violated was an objectively reasonable mistake.

---

[3]To date, Missouri courts have not been presented with the question of whether air fresheners hanging from a rear view mirror would constitute a violation of the ordinance. However, other courts faced with the same issue and the same language in an ordinance have routinely held that something hanging from a rear view mirror is not a violation of an ordinance prohibiting the driving of a vehicle while something "upon" the windows is obstructing the driver's view. See United States v. King, 244 F.3d 736, 740 (9th Cir. 2001), interpreting an ordinance nearly identical to the ordinance at issue here: "[T]he ordinance's use of 'upon' the front windshield requires placement on or in direct contact with the windshield. An object hanging elsewhere, even if in close proximity, does not trigger a violation of the ordinance."

11

There are no cases in Missouri[4] dealing with air fresheners, or any other material, hanging from a rear view mirror in the context of being any type of law violation. Although the government argues that the officers' mistaken belief was objectively reasonable, its argument relies on the officers' subjective belief to establish objective reasonableness: "Based on both Officer Whetro and Officer Apple's training and experience, they had an objectively reasonable belief . . . ." (see page 6 of response). The officers' subjective good faith is not sufficient to justify the stop, "for officers have an obligation to understand the laws that they are entrusted with enforcing, at least to a level that is objectively reasonable. Any mistake of law that results in a search or seizure, therefore, must be objectively reasonable to avoid running afoul of the Fourth Amendment." United States v. Martin, 411 F.3d 998, 1001 (8th Cir. 2005).

In United States v. Murillo-Figueroa, 862 F. Supp. 2d 863 (N.D. Iowa 2012), the defendant was stopped for having air fresheners shaped like trees hanging from the rear view mirror. The deputy in that case believed that the air fresheners constituted a violation of I.C.A. § 321.438.1 which states that, "A person shall not drive a motor vehicle equipped with a windshield, sidewings, or side or rear windows which do not

_____

[4]I do note, however, that in State v. Brumm, 163 S.W.3d 51 (Mo. Ct. App. 2005), an officer in Springfield, Missouri, used information obtained from a college parking tag hanging from a rear view mirror to identify the driver who was then cited for careless and imprudent driving and driving under the influence. Springfield has an ordinance similar to the one at issue which provides that, "No person shall operate a vehicle on a public street while the driver's view to the front, side or rear of the vehicle is so obstructed as to render the vehicle not reasonably safe to operate." Springfield Code Section 106-25. Despite that ordinance not being limited to material "upon" the windshield, the officer did not cite the driver for a violation of the ordinance based on the college parking tag hanging from the rear view mirror.

permit clear vision." The court found that the air fresheners hanging from the rear view mirror did not constitute a violation of this ordinance and that the officer's belief that they did was not objectively reasonable:

> The court finds that Deputy Perdew's belief that the defendant's air fresheners in his vehicle violated Iowa Code section 321.438(1) was not objectively reasonable. Photographs of the defendant's vehicle taken after its seizure indicate that four or five air freshener "trees" three or four inches in length hung from the rearview mirror of the defendant's vehicle. The air fresheners did not extend beyond the width of the rearview mirror. These did not prevent a "clear vision" through any of the vehicle's windows. Deputy Perdew did not have probable cause to stop the defendant's vehicle based on an obstructed windshield on February 7, 2012.

People v. Moffitt, 2012 WL 7105557 (Ill. App., April 6, 2012), dealt with 625 ILCS 5/12-503(c) which reads:

> No person shall drive a motor vehicle with any objects placed or suspended between the driver and the front windshield, rear window, side wings or side windows immediately adjacent to each side of the driver which materially obstructs the driver's view.

Moffitt had been stopped for having air fresheners hanging from his rear view mirror, and he subsequently was arrested for possession of marijuana found in the car. After Moffitt challenged the reasonableness of the initial stop, the court granted his motion to suppress.

> Here, the defendant was stopped because of an air freshener hanging from the rear view mirror and obstructing his view of the roadway. . . . [W]hat is at issue is not whether the officer correctly determines that the object constitutes a material obstruction but whether the officer reasonably believes it to be so at the time he initiates the stop. . . . In [the] photograph, the clipped-together air fresheners do not appear to be a material obstruction, and Officer Marlow offered no testimony at the hearing to explain why he believed otherwise when he first saw them through the windshield from a distance of 30 feet.

> Most importantly, Officer Marlow did not testify to any facts that would explain why he thought the air fresheners materially obstructed the defendant's view before he made the stop. See Jackson, 335 Ill.App.3d at 316, 780 N.E.2d at 829

13

(explaining that the relevant inquiry is whether facts known to the arresting officer when he initiates the stop would give a reasonable officer support for the stop).

Because there were no facts explaining why the air fresheners were a material obstruction, and because the photographs of the car and the air fresheners did not appear to the court to constitute a material obstruction, the stop was found not to be objectively reasonable.

An ambiguity in the ordinance can result in a finding that a mistaken interpretation of the ordinance was objectively reasonable. For example in United States v. Martin, 411 F.3d 998, 1001 (8th Cir. 2005), the ordinance (a tribal ordinance) at issue reads as follows:

> It shall be unlawful for any person to drive . . . any motor vehicle which . . . is not at all times equipped with the following: . . .
>
> > (3) STOP LIGHTS: All motor vehicles shall be equipped with a stop light in good working order at all times. Such stop lights to be automatically controlled by brake adjustment.

Officer Keith Grube stopped Martin's car for having one non-functioning brake light. Subsequent to that traffic stop, marijuana was discovered and Martin was charged with a drug crime. He argued that because the Oglala Sioux Tribal Ordinance only requires "a" stop light and his car had one functioning brake light, he had not violated the ordinance and the officer had no objectively reasonable basis for believing the ordinance had been violated. The court disagreed:

> Although the paucity of evidence presented makes this a close case, we ultimately conclude that Grube's action was not objectively unreasonable. We should not expect state highway patrolmen to interpret the traffic laws with the subtlety and expertise of a criminal defense attorney. While an expert defense attorney, and even a federal judge, ultimately might conclude that the plain language of the Code technically requires only that a vehicle have one "stop

14

light" in working order, we think it is fair to say that the Code is counterintuitive and confusing.

The requirement common to States in the region is that all brake lights on a vehicle like Martin's must be in good working order, and the record is silent as to why the Tribe might have varied from this norm to permit operation of a vehicle with one non-functioning brake light.  Even this tribal code provision, with its odd reference to "a stop light" in working order, is entitled "STOP *LIGHTS*," and further provides that "[s]uch stop *lights* to be automatically controlled by brake adjustment." We recognize that a close textual analysis might explain the use of the plural in the heading and second sentence, while still making sense of a singular requirement in the first sentence, but we think the level of clarity falls short of that required to declare Officer Grube's belief and actions objectively unreasonable under the circumstances.

United States v. Martin, 411 F.3d at 1001-1002 (internal citations omitted) (emphasis in the original).

In this case, there is no such ambiguity.  The ordinance in this case can be violated only by something being "upon" the car window.  There are myriad other jurisdictions which prohibit items between the driver and the windshield which would block the driver's view.  There are also myriad other jurisdiction with ordinances worded just like the one at issue here (many of these are cited in defendant's motion).  None of those jurisdictions have found the ordinances to be confusing or ambiguous.  One would be hard pressed to present a plausible argument that "upon the front windshield, side wings or side or rear windows" means anything other than upon the front windshield, side wings or side or rear windows.  See United States v. King, 244 F.3d 736, 740 (9th Cir. 2001), interpreting an ordinance nearly identical to the ordinance at issue here:  "[T]he ordinance's use of 'upon' the front windshield requires placement on or in direct contact with the windshield. An object hanging elsewhere, even if in close proximity, does not trigger a violation of the ordinance."

15

Based on the above, I find that the air fresheners hanging from the rear view mirror did not constitute a violation of municipal ordinance 70-849(a). I further find that it was not objectively reasonable for the officers to believe that the air fresheners constituted a violation of municipal ordinance 70-849(a).

**B.     STOP BASED ON REASONABLE SUSPICION OF DRUG ACTIVITY**

Alternatively the government argues that the police had reasonable suspicion that defendant was involved in a drug crime, which justified the stop. In fact, the bulk of the testimony at the suppression hearing dealt with the officers' suspicions that drugs and guns were being sold out of the auto detailing shop where defendant's car had been observed. The government argues that

> Officer Whetro and Officer Apple had reasonable suspicion to believe that the defendant may be in unlawful possession of a controlled substance. . . . The officers had information from multiple confidential sources that the auto detailing shop owner was selling cocaine, PCP, marijuana and firearms from the shop. Officers observed numerous vehicle[s] making frequent short trips to and from the shop. They saw several were rental vehicles. The[y] saw individuals close the shop door when the patrol car would pass by the shop. Officer Whetro made multiple traffic stops on other vehicles that yielded arrests for individuals in possession of controlled substances prior to June 14, 2013. . . . The officers saw the defendant's [car] frequently coming and going from the auto detailing shop located on the northwest corner of 57th Street and Prospect, for the past several weeks. Officer Whetro saw the defendant's vehicle coming and going every day for the three days leading up to June 14, 2013. The officers did not notice any change in the appearance of the defendant's car when it was coming and going from the auto shop, which would be expected if someone was actually utilizing the services of an auto detailing shop.[5]

_____

[5]There was, in fact, no relevant evidence that the car had not been detailed. Officer Whetro testified that the shop would wash and detail cars as opposed to performing body or mechanical work, and that "there was never any damage or any repairs made on the outside" of defendant's car (Tr. at 9, 15). There was no evidence that the car arrived clean or that it left dirty -- an auto detailing shop would not be repairing body damage, as Officer Whetro acknowledged.

Case 4:14-cr-00034-BP   Document 27   Filed 02/13/15   Page 16 of 22

The totality of the circumstances determines whether officers have reasonable suspicion to justify a stop. United States v. Sokolow, 490 U.S. 1, 7 (1989). "Reasonable suspicion is a lower threshold than probable cause, and it requires considerably less than proof of wrongdoing by a preponderance of the evidence." Williams v. Decker, 767 F.3d 734, 739 (8th Cir. 2014) (internal citation omitted); United States v. Carpenter, 462 F.3d 981, 986 (8th Cir. 2006).

Articulating precisely what "reasonable suspicion" means is not possible. Ornelas v. United States, 517 U.S. 690, 695 (1996). It is a commonsense, nontechnical conception that deals with "'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Illinois v. Gates, 462 U.S. 213, 231 (1983) (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949)). See also United States v. Sokolow, 490 U.S. 1, 7-8 (1989). As such, the standards are "not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. at 232. The Supreme Court has described reasonable suspicion simply as "a particularized and objective basis" for suspecting the person stopped of criminal activity." Ornelas v. United States, 517 U.S. at 696 (quoting United States v. Cortez, 449 U.S. 411, 417-418 (1981)). Reasonable suspicion is a fluid concept that takes its substantive content from the particular context in which the standard is being assessed. Ornelas v. United States, 517 U.S. at 696; Illinois v. Gates, 462 U.S. at 232; Ker v. California, 374 U.S. 23, 33 (1963) ("This Cour[t] [has a] long-established recognition that standards of reasonableness under the Fourth Amendment are not susceptible to Procrustean application"; "[e]ach case is to be decided on its own facts and circumstances." (internal citations omitted)). See also Terry v. Ohio, 392 U.S. at 29 (the

17

limitations imposed by the Fourth Amendment "will have to be developed in the concrete factual circumstances of individual cases").

The principal components of a determination of reasonable suspicion will be the events which occurred leading up to the stop, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion. Ornelas v. United States, 517 U.S. at 696. "A police officer views the facts through the lens of his police experience and expertise. The background facts provide a context for the historical facts, and when seen together yield inferences that deserve deference." Id. at 699. Therefore, the facts must be viewed in light of the officers' experience and familiarity with drug trafficking and other criminal activity. United States v. Johnson, 64 F.3d 1120, 1124 (8th Cir. 1995), cert. denied, 516 U.S. 1139 (1996); United States v. Condelee, 915 F.2d 1206, 1209 (8th Cir. 1990). "Even innocent actions may give rise to reasonable suspicion if they warrant consideration under the totality of the circumstances." United States v. Johnson, 64 F.3d at 1124.

The government argues that the police had reasonable suspicion to believe that defendant had participated in an illegal drug transaction and "may be in unlawful possession of a controlled substance." I disagree. Although an argument can be made that police had reasonable suspicion that illegal drug activity was going on at the auto detailing shop, they did not have reasonable suspicion to believe that *defendant* would be in possession of illegal drugs at the time he was stopped.

In United States v. Robinson, 119 F.3d 663, 667 (8th Cir. 1997), police stopped Robinson's car as he was driving away from a known crack house. The police had an

arrest warrant for one of the residents and warrants to search the house itself.  The police also observed apparent drug sales on the premises:  cars pulled up briefly in front of the house, exchanged something with one of the residents, and left.  Police observed Robinson drive up to the suspect house, leave his car, and walk toward the residence, though the police could not see whether he entered it.  Police recognized Robinson as a past drug offender with a criminal history.  A reliable informant had also informed them that Robinson had recently made a large drug purchase.  Two minutes later Robinson returned to his car and left.  Police stopped Robinson in his car shortly after he left and found crack cocaine on his person.  The court in that case held that "[a]ll of this information created a reasonable and articulable suspicion that [Robinson] had just engaged in a drug transaction" and the stop was therefore found to be lawful.

In United States v. Spotts, 275 F.3d 714 (8th Cir. 2002), police had received several intelligence reports stating that Spotts was distributing methamphetamine and that he carried a 9mm handgun.  Spotts was seen arriving at a drug house, getting out of his Blazer, looking under his vehicle with a flashlight, and then getting back inside and driving away.  He was not seen entering the residence or speaking with anyone there.  The next day police executed a search warrant at the residence.  About three hours after the search began, Spotts's Blazer returned to the scene, drove slowly past the residence, and was waved over by two uniformed troopers standing on the front lawn of the residence.  Officers observed in plain view inside Spotts's vehicle a 9mm handgun and plastic bag of what appeared to be methamphetamine.  In upholding that stop, the court noted that Spotts had been seen driving to and by the residence twice while it was under surveillance for suspected drug activity, police had previously

19

witnessed at least one apparent drug sale at the residence, Spotts had been observed near the residence (although not inside) for only a short period of time which is consistent with a drug transaction, police had obtained a search warrant for the residence, and police had information from informants that Spotts was involved in drug activity.

In both of these cases, men who had been seen at places suspected of drug dealing were stopped near those residences. In this case, defendant had been seen at a place suspected of drug dealing and was stopped near that location. This, however, is where the similarities end. In <u>Robinson</u> and <u>Spotts</u>, police had obtained search warrants, requiring a probable cause determination by a judge. In this case, police had not obtained a warrant to search the auto detail shop and no judicial probable cause finding had been made. In <u>Robinson</u> police knew Robinson had a history of drug dealing and had been told that he recently had made a large drug purchase, and in <u>Spotts</u> police had received intelligence information that Spotts was distributing methamphetamine and carried a 9mm handgun. In this case, police had received intelligence information about the auto detailing shop, but none regarding defendant. Police not only had no incriminating information about defendant, they could not even say whether defendant was the person who had been driving the car on the days when the car had been observed at or near the auto detailing shop. The uncontradicted evidence is that one officer could not see the person driving and the other officer could only tell that it was a male. There is no evidence that the same male was driving the car each time it was seen.

20

The evidence presented at the hearing establishes that the auto detail shop was located at 57th and Prospect. Defendant was observed by police on the day of his arrest at 53rd Street, which is north of 57th Street, and a few feet east of Prospect (P. Ex. 2). Police observed defendant head south on Highway 71. Therefore, it is not reasonable to assume that defendant had just come from the auto detail shop, for if he had, he would have then traveled four blocks north in order to turn around and head south again on the highway. Finally, defendant's car had last been seen near the auto detailing shop at 2:42 p.m. that day -- well over five hours before the officers pulled defendant over for having air fresheners hanging from his rearview mirror.

Based on the totality of the circumstances, I find that the police did not have reasonable suspicion to believe that criminal activity had occurred or was occurring at the time they stopped defendant's car.

## IV. CONCLUSION

Based on all of the above, I find that (1) air fresheners hanging from a rearview mirror did not constitute a violation of municipal ordinance 70-849(a), (2) the officers' mistake of law was not objectively reasonable, and (3) the stop of defendant's car was not supported by reasonable suspicion that illegal drugs would be found in the car. Therefore, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order granting defendant's motion to suppress.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has 14 days from the date of this report and recommendation to file and serve specific objections.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
February 13, 2015

Case 4:14-cr-00034-BP   Document 27   Filed 02/13/15   Page 22 of 22